MASCOT STOVE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 91265. Promulgated December 7, 1939.

*Robert A. Littleton,* Esq., for the petitioner.
*L. W. Creason,* Esq., and *A. H. Monacelli,* Esq., for the respondent.

OPINION.

DISNEY: This proceeding involves income tax liability for the fiscal year ended June 30, 1934. The deficiency determined by the Commissioner is $3,197.22.

The Mascot Stove Manufacturing Co. (hereinafter called the old company) was adjudicated a bankrupt on June 20, 1933. Its real estate, situated in Hamilton County, Tennessee, and its machinery, tools, and other equipment located on its premises and fully described in an inventory filed with the trustee in bankruptcy, together with the good will of the old company, were encumbered by a mortgage to Adolph S. Ochs, which mortgage, with interest and taxes, amounted to in excess of $30,000; and the property covered by the mortgage was appraised in the bankruptcy proceedings for less than the amount of the mortgage.

On July 3, 1933, the trustee in bankruptcy received an offer from one Luke O. Morin, as trustee for himself and a corporation to be organized, to pay $50 for a conveyance of the property mortgaged to Ochs, subject to the mortgage and existing liens. As the trustee, under the circumstances, had been preparing to disclaim interest in the property, the offer was accepted, and deed of conveyance was by the court ordered made upon payment of the $50.

On July 7, 1933, Alvin Ziegler, trustee, made an offer to pay $7,500 for the old company's assets, not covered by the mortgage, consisting in the main of an inventory of castings, stove parts, stoves, materials, and an equity in accounts receivable, which were subject to a lien of $11,297.26 to a finance company and which equity was appraised at $2,351.75. The remainder of the assets purchased by Ziegler was appraised at $9,280.50.

Ziegler's offer was accepted. The order of the court confirming the sale to him directed the purchaser to pay to the trustee in bankruptcy the sum of $2,500 and execute for the balance three notes, each for the sum of $1,000, and one note for $2,000, all payable to the trustee, respectively, in 30, 60, 90, and 120 days after date. The order further provided: "The title to the assets herein sold shall remain vested in the trustee in bankruptcy until the balance of the purchase price is paid. * * * Upon the payment of said notes evidencing the payment of the purchase price, the trustee will execute a bill of sale transferring and conveying the property herein described to the purchaser."

Alvin Ziegler, trustee, in purchasing the inventories, accounts receivable, etc., assets of the old company, acted for himself and for most, but not all, of the stockholders of the old company and a corporation to be formed. In the transaction, Ziegler represented the following named persons, who held stock in the old company in the amounts set opposite their names:

|  | Shares | Shares held |
|---|---|---|
| John O. Fowler, 208 shares of the preferred stock, being all of the preferred and 369 shares of the common | 577 | |
| Mary E. Fowler | 75 | |
| Lena S. Fowler | 89 | |
| Ben W. Fowler, deceased, Frank E. Fowler, administrator | 75 | |
| John O. Fowler, Jr. | 9 | 987 |
| Frank E. Fowler | 150 | |
| Richard C. Fowler | 9 | |
| James Sterchi Fowler | 3 | |
| W. R. Samuels, 200 shares issued in the name of Alvin Ziegler, trustee, and 272 issued in the name of Agnes O'Connell, maiden name of wife of Samuels, but all considered and treated as Samuels' stock. | | 472 |

| | Shares held |
|---|---|
| O. T. Tindell, Jr., 340 shares issued in name of O. T. Tindell, Sr.; 60 shares issued in the name of Nell Hall (maiden name of O. T. Tindell, Jr.'s wife); 30 shares issued in the name of Nell Hall Tindell (wife of O. T. Tindell, Jr.) and 827 shares in the name of O. T. Tindell, Jr., all treated as the stock of O. T. Tindell, Jr. | 1,257 |
| Alvin Ziegler | 67 |
| W. J. Lammers | 20 |
| George L. Dover | 15 |
| A. R. Hudson | 258 |
| Total | 3,076 |

The entire stock, preferred and common, of the old company, was approximately 3,800 shares. The exact number of shares is not shown by the record.

On July 7, 1933, application for a charter was made to the State of Tennessee, and on July 8, 1933, it was issued to the petitioner herein, the Mascot Stove Co. (hereinafter called the new company). The incorporators were R. B. Cooke (Ochs' attorney), Alvin Ziegler (a lawyer), and L. D. Hill, a stenographer in Ziegler's office. The maximum number of shares of stock the company was authorized to have outstanding at any time was 5,500, of which 500 shares were to be preferred stock, having a par value of $100 per share, or an aggregate authorized preferred stock of $50,000, and 5,000 shares were to be common stock without any par value.

The first meeting of the incorporators of the new company was held on July 14, 1933, at the office of R. B. Cooke, the following persons, incorporators, being present: R. B. Cooke, Alvin Ziegler, and L. D. Hill—Cooke serving as chairman and Ziegler as secretary. The charter of the new company was presented and accepted, and the following action was taken, as shown by the minutes:

On motion duly made, seconded and carried it was ordered that the books of the company be opened for subscription to preferred stock, and the following subscribers for such preferred stock were announced:

| NAME | No. SHARES | PAR VALUE | TOTAL |
|---|---|---|---|
| Alvin Ziegler | 10 | $100.00 | $1,000.00 |
| Alvin Ziegler, Trustee | 25 | " | 2,500.00 |
| Alvin Ziegler " | 25 | " | 2,500.00 |

Alvin Ziegler reported that in his own name as trustee he had purchased the finished goods, accounts receivable, both pledged and unpledged of the old Mascot Stove Manufacturing Company by an order which had been entered in the Bankruptcy Court for the sum of $7,500, $2,500.00 cash and the remainder represented by four notes, the first three for $1,000.00 each and the 4th note for $2,000.00, maturing 1, 2, 3 and 4 months after date respectively.

Mr. Ziegler also reported to the meeting that the plant of the Mascot Stove Manufacturing Company, consisting of land, buildings, machinery, equipment

and patterns, was covered by a mortgage owned and held by Mr. Adolph S. Ochs; that an associate, Luke O. Morin, held a conveyance of this property from the trustee in bankruptcy; that Adolph S. Ochs had foreclosed on the mortgage, but on account of the identity of the individuals whom he (Ziegler) represented and who are organizing the Mascot Stove Co., he is willing for the new company to take over the plant upon execution of a new mortgage to him and payment of the accrued taxes and other expenses. Mr. Ziegler then offered to transfer to the new company the assets acquired from the trustee in bankruptcy and the privilege of acquiring the plant, upon the following terms:

Payment of _____ $7,500.00
    To be paid $2,500.00 in cash and notes to himself to correspond
    to the notes which he had executed to the trustee in bankruptcy.
Taking the Accounts Receivable subject to the claim of the Manufac-
    turers Finance Corporation for_____ 11,297.26
Assuming and paying expenses of_____ 532.00
Assuming and paying accrued taxes of_____ 2,090.13
Executing to Adolph S. Ochs a mortgage, secured by the plant, for__ 33,000.00
Issuance to his order of 5,000 shares of no par common stock, having
    a stated value on the books of the Mascot Stove Company of_____ 70,124.00

On motion duly made, seconded and carried, it was ordered that the above offer be accepted and that the officers of the company be authorized and instructed to do the things necessary to complete the transaction and acquire the property.

The incorporators then tendered their resignations as members of the board of directors to become effective when a meeting of stockholders was held, and a new board was elected. Upon motion duly made, seconded and carried, it was ordered that said meeting be adjourned.

Twenty-five shares of preferred stock subscribed for by Alvin Zielger, trustee, as above indicated were for W. R. Samuels and the other 25 preferred shares similarly subscribed were for John O. Fowler. The preferred stock was paid for in cash, $6,000. Immediately after the meeting of the incorporators, on July 14, 1933, the first meeting of stockholders was held. There were present Alvin Ziegler, individually and as trustee, and O. T. Tindell, Jr., and O. T. Tindell, Sr., by proxy. The only business transacted was adoption of bylaws and election of L. O. Morin, A. R. Hudson, O. T. Tindell, Jr., George Dover, and Alvin Ziegler as directors.

The board of directors of the new company, on July 14, 1933, elected the following officers: L. O. Morin (who had been president of the old company) was elected president of the new company; A. R. Hudson was elected vice president, O. T. Tindell, Jr., treasurer and general manager, and Alvin Ziegler, secretary.

The interest of each person in the property acquired by Alvin Ziegler, trustee, at the bankruptcy sale was in the same ratio that the number of shares held by each in the old company bore to the total number of shares in the old company represented by the group, and the amount of stock in the new corporation which each was

entitled to receive and did receive, was in substantially the same proportion as his ownership of the assets exchanged for stock, although the stock certificates issued at a later date were not in the same proportion. The transferors were in control of the new corporation immediately after the exchange.

The new company, by transfer through Alvin Ziegler, trustee, acquired the inventoried assets and accounts receivable of the old company, and the assets that were covered by the mortgage to Ochs were deeded by Ochs to the new company and it executed back to Ochs a mortgage for $33,000, paid the expenses incident to the transaction, amounting to $532, and paid the accrued taxes, amounting to $2,019.13. The real estate, machinery, tools, and equipment and the patterns that had been used in manufacturing the inventoried parts and finished goods and included in the sale under the mortgage to Ochs, and the conveyance to Luke O. Morin by the trustee in bankruptcy were included in the transfer by Alvin Ziegler, trustee, to the new company, Ziegler having acquired the right to deal therewith, though the record does not otherwise show a conveyance to Ziegler of the rights of Luke O. Morin.

The new company paid Alvin Ziegler, trustee, for the assets that he transferred to it, $2,500 in cash and executed to him $5,000 in four notes and issued to him and stockholders whom he represented 5,000 shares of no par common stock. The four notes were in the same amounts and due on the same dates as the notes which Ziegler himself had originally executed to the trustee in bankruptcy for said assets. All four notes were paid by the new company. The $2,500 paid by Ziegler, trustee, on the purchase of the assets, was supplied by W. R. Samuels and 25 shares of the preferred stock of the new company of the par value of $100 a share was issued to Alvin Ziegler, trustee, for W. R. Samuels, as hereinabove set forth.

From the time the old company was adjudicated a bankrupt down to and including the acquisition by the new company of the real estate, equipment, inventories, and accounts receivable of the old company, Ziegler, trustee, Morin, and their associates contemplated the organization of another corporation and acquiring for it the assets of the old company and carrying on the same character of business.

On September 18, 1933, the entire common stock of the new company was issued to or for the hereinafter named individuals whom Alvin Ziegler, trustee, represented in the purchase from the trustee in bankruptcy of the old company's assets, which were to be and were turned over to the new company. In the division of the stock of the new company no distinction was made as between the preferred and common stock held by John O. Fowler in the old com-

pany. The common stock of the new company was divided and
issued as follows:

| | Shares |
|---|---|
| O. T. Tindell, Jr. | 1,000 |
| Alvin Ziegler | 1,000 |
| John O. Fowler | 1,200 |
| Mrs. Mary E. Fowler | 75 |
| Ben W. Fowler (Frank E. Fowler, administrator) | 75 |
| Frank E. Fowler | 150 |
| A. R. Hudson | 150 |
| W. J. Lammers | 70 |
| T. B. Hannah | 15 |
| Irma K. Dover | 65 |
| W. R. Samuels | 1,200 |
| Total | 5,000 |

The face amount of good accounts receivable acquired by the new
company is shown to have been $11,311.66 (book figures $22,608.92
less $11,297.26 sold to finance company to discharge mortgage thereon).
Of the $7,500 paid the trustee in bankruptcy, the respondent deter-
mined $2,148 thereof was for the accounts receivable. The respondent
determined that during the fiscal year ended June 30, 1934, there
remained a realizable profit in the amount of $9,163.66 of accounts
receivable when collected, that at the end of the fiscal year ended June
30, 1934, there remained uncollected $1,747.48, making the profit
realized during the taxable year ended June 30, 1934, $7,416.18.

Respondent adjusted inventories and reduced the opening inventory
at the beginning of the taxable year from $28,184.34 (as per taxpayer's
books) to $5,352 (portion of the $7,500 purchase price allocated to
inventories). The closing inventory at the end of the taxable year
(June 30, 1934) was, by respondent, reduced from $30,426.24 to $21,-
393.30, predicated upon the fact shown by the record that about 40
percent of the opening inventory was on hand at the close of the taxable
year, 60 percent thereof having been disposed of. Realizable profit on
all inventories was determined by the respondent to be $22,832.34, being
the amount of the opening inventory, $28,184.34, less $5,352 purchase
price, 60 percent thereof, or $13,699.40, being the profit realized from
said inventories during the taxable year.

The first question herein presented for determination is as to what
is the proper base to be used in calculating profit or loss to petitioner
during the taxable year from certain of the assets acquired as above set
forth by petitioner. Profit was determined by respondent (a) by
adjustment in petitioner's inventory of assets because of sales during
the taxable year, and (b) because of profit in collection of certain
accounts receivable during the taxable year. Respondent contends
that the base to be applied in computing profit or loss is the price paid
for the assets at the bankruptcy sale, on the theory that Ziegler, trustee,

the buyer, was agent or trustee for the petitioner corporation, or, if not, that he and those represented by him were in control of the petitioner corporation immediately after the exchange of property for stock of the corporation, and received stock substantially in proportion to their interests in the assets exchanged, under the provision of section 112 (b) (5), Revenue Act of 1932, and that therefore under section 113 (a) (8) (A) the base is the same as that of the transferors, and therefore the price paid at the bankruptcy sale by Ziegler, trustee; whereas petitioner contends that the base is the fair market value at time of acquisition on July 14, 1934, contending in effect that Ziegler and those for whom he was trustee acted individually, not as agents or trustees for the new corporation, and, though admitting that the transferors of the assets to the petitioner in exchange for stock were in control of the company immediately after the exchange, affirming that the statutes relied upon by respondent do not apply because the amount of petitioner's stock received by the transferors was not substantially in proportion to the interest of each transferor in the assets exchanged for stock.

We hold that there was no reorganization. There was no continuity of interest between the old company and the new, no exchange of stock or securities for stock or securities, under section 112 (b) (3) of the Revenue Act of 1932, the only section relied upon to prevent recognition of gain or loss on the exchange, and the old company did not pursue a plan of reorganization, the only plan being that of about three-fourths of the stockholders, acting not as such but as individuals, there being no corporate action. There was no representation of the old company by creditors or bondholders as in *Commissioner* v. *Kitselman*, 89 Fed. (2d) 458. A mere purchase of assets at bankruptcy sale does not demonstrate reorganization. *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; *Petree* v. *United States*, 34 Fed. (2d) 563; affd., 41 Fed. (2d) 517; *Beverly Wall Paper Co.*, 36 B. T. A. 353.

Upon brief petitioner asserts that respondent, in contending that petitioner was the purchaser at the bankruptcy sale, has varied from the deficiency notice, without affirmative pleading. We think the respondent's present position is within the purview of the determination of deficiency. No increase of amount of deficiency is sought.

Examination of the record herein indicates, we think, that the petitioner corporation was, as contended by respondent, the purchaser at bankruptcy sale and takes as basis the price then paid for the assets in question. That a new corporation was contemplated at all times after the adjudication can not successfully be denied in the face of the fact that Luke O. Morin, in purchasing the equity of the bankrupt estate in the other assets of the old company, that is, the real estate, machinery, equipment, stove patterns, etc., covered by the Ochs mortgage, purchased "as trustee for a new corporation to be organized."

This expression occurs three times in the record of that sale. In fact, title to the same property acquired by Morin later passed directly to the new corporation, when Ochs conveyed same. Morin was an associate of Alvin Ziegler, who purchased the assets here involved, that is the inventory (of stoves, parts, etc.) and accounts receivable. That they were cooperating can not be overlooked. Though Ziegler as trustee purchased the last named assets, the title could not pass, under the order of the bankruptcy proceeding, until the last note, due in 120 days, was paid. By that time, of course, the new corporation had long been formed. Though the record is silent as to whether title then passed directly from the trustee in bankruptcy to the new corporation, title could not have passed to it from Ziegler at the date of the exchange on July 14, because at that time, prior to payment of the notes, Ziegler had no title to convey. Though in a sense Ziegler did represent in the purchase at bankruptcy sale a part of the former stockholders, we think he represented them as trustee in an agreement to form the new corporation, in the same position in that respect as was Morin for the other assets. Tindel was "working up the corporation * * * working the deal through * * * trying to continue the business." Ziegler was his attorney. The new corporation stepped into the shoes of the trustee, Ziegler, made notes in the same amounts and payable at the same times as had Ziegler to the trustee in bankruptcy. Though there was testimony that propositions other than incorporation were mentioned, the fact is that on the day of Ziegler's purchase, July 7, application for the corporate charter for petitioner was applied for, and charter was issued the next day and the first meeting held less than a week later. It is obvious that the parties intended to, and did, proceed at once with a new corporation. We believe that the old stockholders who entered into the block represented by Ziegler as trustee had a right to the formation of the new corporation to hold the property, that Ziegler as trustee was under that duty, and that when the whole sequence of events is considered he must be considered as purchasing as trustee for the new corporation; and that therefore the basis to the petitioner is the price paid at the bankruptcy sale. This conclusion is sustained by the petition, which recites that a part of the old stockholders "entered into a plan or arrangement between themselves, the trustee in bankruptcy and the secured creditors * * * to perfect a reorganization, by organizing a new corporation * * * in the name of the Mascot Stove Company to acquire the assets of the Mascot Stove Manufacturing Company by the payment of $7,500 in cash * * *," etc. Though this did not result in reorganization, it does outline the plan which was consummated. This conclusion is supported too by O. T. Tindell's testimony that the new corporation was "formed to take over that

property," and, referring to the plant of the old company (sold under mortgage to Ochs, "Mr. Ziegler acquired the *right to transfer this property into a new company* for the purpose of going ahead with the stove business." (Emphasis supplied.) We hold that the purchase at the bankruptcy sale by Ziegler, trustee, was for and by the petitioner through trustee. That the price at such sale was a low or bargain price, because the inventory of stoves and parts had small value, unless acquired by one owning the patterns, is immaterial; that price represented cost to the petitioner.

However, even if we were incorrect in the above conclusion, the same basis was properly applied by the respondent for there was, in our opinion, the substantial equivalence between ownership of assets prior to exchange and stock in petition after the exchange as required by section 112 (b) (5) of the Revenue Act of 1934.

The petitioner relies upon the fact that the stock certificates in petitioner corporation, when issued to the transferors of assets, were not in substantially the same proportion as they had owned the assets. The stock certificates were issued September 18, 1933, as to the entire 5,000 shares, whereas the exchange was, under petitioner's own theory, effected on July 14, 1933. Issuance of certificates in certain amounts on September 18 does not, of itself, determine ownership of the stock on July 14. It has been held that the control which affects the question of computation of gain or loss on base, must be "immediately after the exchange." *Schmieg, Hungate & Kotzian, Inc.*, 27 B. T. A. 337, 342; *Federal Grain Corporation*, 18 B. T. A. 242; *Evans Products Co.*, 29 B. T. A. 992, 997; sec. 112 (b) (5), Revenue Act of 1932. Obviously, the same thought applies to the ownership of stock in proportion to previous ownership of stock transferred, for the base involved in the exchange is determined by the situation at the time of exchange. Later acts, such as transfer of stock owned at time of exchange, can not affect the base. But ownership of stock is not dependent upon possession of certificates therefor. *Federal Grain Corporation*, supra; *Elvira Scatena*, 32 B. T. A. 675; *Anita Owens Hoffer*, 24 B. T. A. 22, citing *Richardson* v. *Shaw*, 209 U. S. 365, and *Jellenick* v. *Huron Copper Mining Co.*, 177 U. S. 1. Petitioner, therefore, has not met its burden of proof merely by showing that the certificates issued September 18, 1933, were out of proportion with the ownership of assets prior to July 14, 1933. The record contains no evidence that the actual ownership of stock immediately after the exchange was the same as represented by the stock certificates at a later date. Indeed, the stock book, showing the 5,000 shares issued September 18, had to be explained and was explained, for in a number of instances the stock was issued in one name when the stock was owned by another. Regardless, however, of the burden, we think it

plain that the evidence of the petitioner shows that, at the time of the exchange, title to the stock was received in proportion to previous ownership of assets; O. T. Tindell, Jr., prominent officer in both corporations, in explaining the stock certificates received by him, testified:

A After we undertook to divide the new stock based on our holdings, Mr. Ziegler wanted more stock on account of his activities in the business and Mr. Samuels wanted more stock on account of having advanced the money and Mr. Fowler insisted that the stock be divided according to the original agreement, and that I get as much stock anyway as I had in the old one, and that is the reason that the 200 shares were issued in my name and endorsed by me to Mr. Ziegler, because I was interested in getting the business going, primarily, but, as a matter of fact, I would have taken less stock than I did, as I was not putting any money into it.

Q You were not putting any money into it?

A No, sir, outside of—I put my equity in the accounts receivable and the merchandise purchased out of the Bankrupt Court.

We think it is beyond question from this language that an attempt was made to divide the new stock "based on our holdings", which can reasonably only mean on the basis of holdings in the assets conveyed, that there then arose a desire on the part of some for a disproportionate amount of stock, particularly a desire by Ziegler for more stock because of his activities and by Samuels because of his advancement of money, whereas Fowler "insisted that the stock be divided according to the original agreement." This, too, plainly indicates that the original agreement for division of stock was for division in accordance with the holdings, or if not that, means that there was some agreement for division of the stock different from the manner or proportion in which the stock was finally divided. Witness Tindell merely "put my equity in the accounts receivable and the merchandise purchased" into the matter. We think this strong indication that such was the basis upon which the other owners of the assets were entitled to stock. Tindell testified further, discussing the question as to whom Ziegler represented: "I told all smaller stockholders that they would come in on the same basis as the larger ones, their equity in the property." Again he stated, as to stock, "I took less than what I was supposed to get." He testified also, "I was the man who was working up the corporation; I was handling it for myself and the rest of the former stockholders and working the deal through, and I was trying to protect myself and the stockholders' interest and continue the business." It is plain that the 5,000 shares of stock were the consideration for the exchange of assets and the owners of the assets were obviously entitled to stock in proportion thereto. The test is the comparative value of holdings, before and after exchange, rather than number of shares. *United Carbon Co.* v. *Commissioner*, 90 Fed. (2d) 43. No change in pro-

portion as to value of holdings after exchange of assets for corporate stock was shown herein. In our opinion, the stock was owned upon the acquisition of the assets by the corporation, and in consideration thereof, by the owners of the assets substantially in proportion to their holdings of the assets, and, therefore, under sections 112 (b) (5) and 113 (a) (8) of the Revenue Act of 1932, the basis of the property acquired and sold in the taxable year, to wit, the inventory and the accounts receivable, is the same as it was in the hands of the transferors, that is to say, the price paid for it by Ziegler as trustee at the bankruptcy sale, or $7,500.

The only question remaining is as to proper allocation of the base between the inventory and the accounts receivable. Of the $7,500 base above approved by us, the respondent allocated $2,148 to accounts receivable and $5,352 to inventory. Since at the hearing petitioner accepted as correct respondent's valuation of $11,311.66 for the equity in the accounts receivable ($22,608.92 book value, less $11,297.26 for discharge of encumbrance to finance company), and since petitioner's books set up the inventory as of a value of $28,184.34, mere mathematical calculation discloses that the allocation made by the respondent is substantially in accord with petitioner's book values, after discharge of existent lien on accounts receivable. Petitioner's argument for comparative values of $21,000 and $28,000 for accounts receivable and inventory neglects the necessity of deducting the encumbrance upon the accounts. We therefore find no error in respondent's allocation of the base of $7,500. Petitioner has shown no error in respondent's computation of the profit realized upon the accounts realized, or in adjustment of inventory, upon the basis of $7,500 and allocated as above approved.

The above opinion modifies the memorandum opinion originally entered herein.

Reviewed by the Board.

*Decision will be entered for the respondent.*